TAMELING *v.* UNITED STATES FREEHOLD LAND AND EMI-
                      GRATION Co.

MEXICAN LAND GRANT — *act of congress.*   The unconditional confirmation of
    a Mexican land claim by act of congress, when such confirmation is made
    in conformity with the recommendation of the surveyor-general of New
    Mexico, that it be confirmed by certain specified metes and bounds is, *ex
    necessitate*, a confirmation of the whole claim, and this is true without
    regard to the question whether the claim was originally valid or void.
When congress has, by confirming a grant as recommended in the report
    of a surveyor-general or other tribunal, sanctioned the rules and
    principles on which such report is based, it is in effect a legislative affirma-
    tion and ratification of the construction put by the surveyor-general or
    other tribunal on the laws in pursuance of which the grant was made.
    A confirmatory statute of congress, being the act of a sovereign power,
    unlike the deed of a private person may make valid a void conveyance.
    The act of confirmation of June 21, 1860, entitled "An act to confirm cer-
    tain private land claims in the territory of New Mexico," is in law a con-
    veyance by way of quit-claim, and release of any interest which the
    United States may have had in the premises confirmed.

*Appeal from District Court, Pueblo County.*

THIS was an action of ejectment brought by the United States Freehold Land and Emigration Company against John G. Tameling for a parcel of land lying within the Costilla estate.  It was submitted upon an agreed statement of facts.  It was agreed that the parcel of land described in the plaintiff's declaration, and for the possession of which the plaintiff brings this suit, is now, and at the time of the commencement of this suit was situate in the county of Costilla, in the territory of Colorado, and at the time of the commencement of this suit, was in the actual possession of the said defendant, who, before the commencement of said suit, had made valuable improvements thereon.

That the said piece or parcel of land is within the exterior boundaries of and forms a part of a larger tract or parcel of land claimed by the plaintiff in fee simple, and known as the "Costilla Estate," which said estate is bounded as follows, viz. : Beginning at a point one league below the confluence of the Rio Costilla and the Rio del Norte ; thence up the Rio del Norte, on the eastern bank thereof, to its confluence with the Rio Culebra ; thence easterly, following the southern bank of the Rio Culebra, to a point at or near the junction of the Rio Seco with the Rio Culebra ; thence easterly to the Culebra Peakes ; thence southerly, to the boundary of the lands of Miranda and Beaubien, and to a point at or near the road to Maxwells ; thence westerly following the mountain ranges along the boundary of the lands of Miranda and Beaubien, to a point about one league south of the Rio Costilla, and thence westerly to the place of beginning, containing, by estimation, five hundred thousand acres, or thereabouts.

That the said Costilla estate, prior to the commencement of this suit, formed a part and parcel of a yet larger tract or parcel of land, known as the "Sangre de Cristo grant ;" from said grant the said estate was segregated by the conveyance thereof by Morton Coates Fisher to the plaintiff, which said conveyance is hereinafter referred to ; and which

said grant as an entirety (including said Costilla estate) is described as follows : Beginning at a point one Spanish league below the confluence of the Rio de Costilla and the Rio del Norte ; thence up the Rio del Norte, on the eastern bank thereof, to a point one league above the mouth of the Rio Trinchera ; thence north-east to a point on the mountain ; thence along said mountain south-east to a point established on the top of said mountain ; thence south to the boundary of the lands of Miranda and Beaubien ; thence along said boundary to a point about one league south of the Rio de Costilla ; and thence west to the place of beginning.

That the said Costilla estate is included in the Sangre de Cristo grant, whether reference be had to the description thereof given in the judicial certificate of possession, or in the petition of Charles Beaubien, herein set forth.

That the said Sangre de Cristo grant is known and designated as "Claim No. 'Fourteen' of Charles Beaubien," in the letter of the secretary of the interior of the United States, transmitting a transcript of the claim of the said Beaubien to said grant to the Hon. N. P. Banks, speaker of the house of representatives, said letter bearing date February 11, 1857, and which said letter, and all of the documents pertaining to said Sangre de Cristo grant, therein referred to, are in the words and figures following, viz. :

Here follows a complete transcript of all the proceedings had by the Mexican authorities for the purpose of vesting title to the Sangre de Cristo grant in the co-grantees, Louis Lee and Narciso Beaubien, and the report of William Pelham, surveyor-general of New Mexico, setting forth the boundaries of the grant, and recommending that it be confirmed. Full reference is made to these proceedings, and to the report in the opinion in this case.

That by purchase and descent, Charles Beaubien acquired, had and possessed all of the rights, titles and interests, both in law and equity in said grant, which were by the proceedings above referred to, in the aforesaid letter of the secretary of the interior, originally vested in the said Narciso Beaubien, and the said Louis Lee. That the said Charles

Beaubien retained his aforesaid interest in said grant, until after the passage and approval of a certain act of congress of the United States, entitled : "An act to confirm certain private land claims in the territory of New Mexico," approved June 21st, 1860.

That the claim designated in said act of congress as claim No. 14, is the claim of the said Charles Beaubien to that tract of land hereinbefore described by its boundaries, and herein designated as the "Sangre de Cristo grant," and which tract of land includes the said " Costilla Estate."

That after the passage and approval of the said act of congress, and on the 7th day of April, A. D. 1864, the right, title and interest of the said Charles Beaubien in and to the said Sangre de Cristo grant, otherwise the said claim No. 14, was absolutely conveyed and vested in Hon. William Gilpin, and thereafter, and prior to the 14th day of July, A. D. 1870, the said Gilpin conveyed the right, title and interest in said grant, by him so derived, to one Morton Coates Fisher ; that thereafter, and on the day and year last aforesaid, the said Morton Coates Fisher absolutely conveyed to the plaintiff his right, title and interest derived as aforesaid, in and to that part and portion of the said "grant" or claim No. 14, generally known and herein designated as the "Costilla Estate," the boundaries of which said estate, as taken from the said conveyance thereof, are hereinbefore given, and include the piece or parcel of land described in the plaintiff's declaration, and the possession of which is in controversy in this suit.

That the said plaintiff has not conveyed or granted his title, derived as aforesaid, to the piece or parcel of land described in the declaration in this cause, nor the right of the possession thereof to the defendant or other person, but has claimed the title to, and possession of, said land ever since the conveyance as aforesaid by the said Fisher to the plaintiff.

Upon the agreed statement of facts, judgment was entered in the court below for the plaintiff, from which the defendant

took an appeal.   His assignments of error are substantially alike, and are in the words following :

1st.  The district court erred in rendering judgment for the plaintiff on the agreed statement of facts filed in this case (which was all the evidence in the case), in this that under the colonization act of Mexico, in force at the time the Sangre de Cristo grant was created, no grant could legally be made in excess of 22 leagues to two grantees, it being conceded by said agreed statement of facts that the Costilla estate alone, which is a part and parcel of said Sangre de Cristo grant, contains alone by estimate 500,000 acres of land, or thereabouts, which is five times as much land as could legally be granted to two parties.

2d.  Because the district court erred in construing the act of confirmation by congress to ratify the original grant to a greater extent than that for which, under the colonization act of Mexico, A. D. 1824, it could have been originally created.

Messrs. GERRY and TAYLOR, for appellants.

Mr. HENRY C. THATCHER and Messrs. SAYRE & WRIGHT, for appellee.

Mr. Justice WELLS did not sit in this case.

BELFORD, J.   The agreed statement of facts filed in this cause in the court below, and in pursuance to which judgment was rendered, presented but a single question for decision, namely, was private land claim *number fourteen* (14), usually known as the Sangre de Cristo grant, a valid grant as to all the land contained within the exterior boundaries of said grant, as shown by the judicial certificate of possession, and the report of the surveyor-general of New Mexico to the commissioner of the general land office, or is the act of congress, approved June 21, 1860, entitled, "An act to confirm certain private land claims in the territory of New Mexico," to be construed as only a confirmation of

22 square leagues, 11 square leagues to each of the original grantees?

The record shows that the premises in controversy are situated within the exterior boundaries of a certain tract of land known as the "Costilla Estate," which estate constituted a part, and was carved out of the Sangre de Cristo grant. The court below held, that the plaintiff was entitled to the premises in dispute in fee, and that it have a writ of possession therefor. From this finding the defendant prayed an appeal. The assignment of errors presents the same point raised in the court below. It is well known as a matter of history, that from a time coeval with the establishment by Spain of colonies in this country the king and likewise his provincial governors, were in the habit of making extensive grants of land to individuals for pastoral, agricultural and colonization purposes. After Mexico had achieved her independence, the same policy was pursued by the supreme and local governments of that country. On the 27th day of December, 1843, Luis Lee and Narciso Beaubien petitioned Manuel Armijo, civil and military governor of New Mexico, for a grant of land "embracing the Costilla, Culebra and Trinchera rivers, including the Rito of the Indians, and Sangre de Cristo, to its junction with the Del Norte river." This petition was referred, on the 30th day of December, 1843, by Manuel Armijo, governor as aforesaid, to the prefect, with instruction to give the possession asked for by the petitioners, in case there was no impediment.

On the 7th day of January, 1844, Juan Andres Archuleta, the prefect, directed the justice of the peace of the demarcation wherein the land was situated, to place the parties in possession in accordance with the decree of the governor, by virtue of which the justice of the peace, Jose Miguel Sanchez, on the 12th day of January, 1844, accompanied by his instrumental and attending witnesses, proceeded to the point where the land petitioned for was situated, and going through the prescribed method of investiture, placed Lee and Beaubien in possession of a tract of

land, whose boundaries were indicated in the following manner : " Commencing on the east side of the Del Norte river, a mound was erected at one league distance from its junction with the Costilla river; thence following the Rio Del Norte, on the same eastern bank, to one league above the junction of the Trinchera river, where another mound was erected; and continuing from west to north-east, following up the current of the Trinchera river, to the summit of the mountain, to the boundary of the lands of Miranda and Beaubien, the fourth mound was established; and continuing on the summit of the Sierra Madre, and following the boundary of the afore-mentioned lands, to opposite the first mound erected on the Del Norte river, where the fifth and last mound was erected, and from thence in a direct line to the first erected on the north." If the act of congress, of June 21, 1860, above referred to, is to be regarded as a confirmation of the Sangre de Cristo grant by metes and bounds, and to the extent of all the land contained within the exterior boundaries of said grant as shown by the judicial certificate of possession, then the judgment of the court below is correct, for the plaintiff derives its title through this act of congress, and the tract sued for constitutes a part of said grant. The act of congress is in the following language : "That the private land claims in the territory of New Mexico, as recommended for confirmation by the surveyor-general of that territory, and in his letter to the commissioner of the general land office, * * * designated as numbers one, three, four, six, eight, nine, ten, twelve, fourteen, fifteen, sixteen, seventeen and eighteen, *be and they are hereby confirmed.* Provided, that the claim No. 9, in the name of John Scolly and others, shall not be confirmed for more than five square leagues ; and that claim No. 17, in the name of Cornelio Vigil and Ceran St. Vrain, shall not be confirmed for more than 11 square leagues to each of said claimants." It becomes important to inquire how and to what extent the claim, No. 14, of Lee and Beaubien was confirmed. The act itself furnishes the answer, " as recommended for con-

firmation by the surveyor-general." What was his recommendation? That the tract of land petitioned for by Lee and Beaubien, "embracing the Costilla, Culebra and Trinchera rivers, including the Rito of the Indians, and Sangre de Cristo to its junction with the Del Norte river," being the land of which they had been placed in possession by the justice of the peace, under the directions of the governor and prefect, be confirmed. The surveyor-general's report is made a part of the act of confirmation by reference in express terms, and "when the king's grant refers in general terms to a certainty, it contains as express mention of it, as if the certainty had been expressed in the same charter." 10 Coke, 64 a.

It is claimed, however, by counsel for appellant, that by the colonization laws of Mexico, passed in 1824, the provincial governors were restrained from granting to any individual more than 11 square leagues ; and, inasmuch as the Costilla estate alone contains 500,000 acres, being five times the quantity which could legally be granted to two persons, the act on the part of the governor was simply void, and that no obligation resting on the United States, under the treaty of Guadalupe Hidalgo, to grant to any citizen more than he was entitled to claim from the Mexican government, the confirmation must be limited to the exact amount of 11 square leagues to each of the parties, Lee and Beaubien. It is further insisted, that inasmuch as the report of the surveyor-general states that Lee and Beaubien "were the legal owners in fee of said claim," and that inasmuch as they could be the legal owners of but 22 square leagues, the maximum amount which could be granted the original grantees by the governor of the province, it must follow that their application to congress was for a confirmation of "a legal estate in fee," to wit, "22 square leagues." It is apparent, from the report of the surveyor-general, that the quantity of land included within these natural boundaries was not known when its recommendation was made to the commissioner of the general land office, or submitted to the senate. It is also apparent that this fact was within the

knowledge or open to the knowledge of congress when the act above referred to was passed ; and had it been the intention of congress to limit the quantity granted to an amount less than that embraced within the natural boundaries, they could have imposed such limitations in their act of confirmation and quit-claim. It does not appear that any fraud or suppression of facts had been committed by the parties seeking the confirmation, and therefore it seems to me that the act must be regarded as an unconditional ratification of the grant as previously made, and as such, was equivalent in law to an original authorization. Furthermore, the claim was for the entire tract included within the natural boundaries, for it affirmatively appeared that the lands had been marked out and delivered by the Mexican officers, and were possessed by the claimants and those holding under them. The confirmation of such a claim is *ex necessitate* of the whole. And the fact that the quantity of land turns out to be larger than supposed, should not be allowed to diminish the force of the act.

We must regard it as a valid confirmation for the entire tract, or treat the act of congress as void, and conferring no rights on Lee and Beaubien, for it nowhere points out the location of a less quantity than the whole. Nor does it provide a mode for the location of the twenty-two square leagues, so that they may be distinguished from the additional lands within the boundaries of the original claim. That this could not have been the intention of congress is apparent, not only from the language of the act itself, but also from the fact that the same act confirmed claims Nos. 5 and 17 to only a limited extent each, and provided the mode in which the amount of land so confirmed should be definitely located and set apart from the balance of the land claimed, but not confirmed to the respective claimants. As to the proposition that the surveyor-general only recommended a confirmation of the legal estate to which the claimants would be entitled under the Mexican law, we think it is met by the argument of counsel for the appellee The surveyor-general recommended the confirmation of the

grant to the full extent of the petitioner's claim, because it is his opinion, "that the grant is a good and valid one, and that the legal title vests in Charles Beaubien, as the successor of Lee and Narciso Beaubien." He tells us substantially that the grants by governors of provinces, though not sanctioned positively by enactments of the Mexican congress, yet had been long regarded valid, and that this grant, by reason of the custom of the country, and the undisputed occupancy of it by the grantees and their representatives from the time it was made, should, in justice, be confirmed to the claimant, he having a title sufficient thereto under the jurisdiction of the former rulers of the country. However inferior this estate may have been to an English fee simple, our government was bound by treaty to respect whatever rights the claimant had. The treaty of Guadalupe Hidalgo found the grantees in the full undisturbed possession of the premises in question, holding under a grant duly made by the governor. The eighth and ninth articles of that treaty embraced provisions similar to those contained in all treaties between civilized nations which provide for a cession of territory from the one to the other; stipulations intended to guard and protect in the most efficient manner the private property of individuals. In the case of the *United States* v. *Arredondo*, 6 Peters, 710, the supreme court say : " When congress have, by confirming the reports of commissioners or other tribunals, sanctioned the rules and principles on which they were founded, it is a legislative affirmation of the construction put by these tribunals on the laws conferring and prescribing the rules on which it should be exercised, or which is, to all intents and purposes, of the same effect in law; it is a legislative ratification of an act done without previous authority, and the subsequent recognition and adoption is of the same force as if done by pre-existing power, and relates back to the act done." It may be proper here to remark, that the mode of adjudicating land claims in New Mexico differs widely from the manner of adjudicating claims of like nature within the State of California. In the case of California

claims, congress provided a commission of inquiry and a judicial investigation, under certain rules and regulations applicable to all claims.   Whereas, in New Mexico, congress provided for the ascertainment and confirmation of these rights of property to the soil by the appointment of a surveyor-general, whose prescribed duty was to ascertain the origin, nature and extent of claims to land under Spanish and Mexican law and usage, and to report on all such claims as originated under those laws, which report was to be laid before congress for final action.   It would seem on principle and from a parity of reasoning, that if congress, by confirming the reports of commissioners to whom were referred like questions, sanctioned the rules and principles on which they were founded, that a like doctrine must be applicable to the report of a surveyor-general. In 1857, the report of the surveyor-general, upon claim No. 14, was transmitted to congress.   It is full and complete, giving all the proceedings and evidence pertaining to the origin, nature and extent of the claim.   The petition of the claimant is embraced in the report, and among other things, contains the statement, "that he cannot show the quantity of land claimed by him only so far as set forth in the foregoing description of points and bounds.   Nor can he furnish a plat or survey of the same, as no survey has ever been made."   The description given in the petition is the same as that heretofore set forth.   There was then no pretense either before the surveyor-general, or afterward before congress, that the claim was measured and contained a specified number of square leagues ; or that the claimant only asked that a certain extent of land within the given boundaries should be confirmed to him.   On the contrary, his claim was openly made to the whole of the described tract, whatever its superficial area might be.   In *Fremont* v. *The United States*, 17 How. 561, the court say :   "The court could not, without doing injustice to individuals, give to the Mexican laws a more narrow and strict construction than they received from the Mexican authorities who were intrusted with their execution."   We have already seen

how the Mexican authorities interpreted their laws by the manner in which they invested the claimants with this estate. But conceding that under the Mexican laws the claimants could take but twenty-two square leagues, still it would appear that by virtue of the treaty of cession the United States became seized of the entire tract, if the antecedent grant was null and void ; and it would seem to follow that they would in such case have the power to grant or withhold, to concede with or without limitations, and they have chosen to do the latter. It is said, however, that there is nothing in a void estate upon which a confirmation can act, for there is nothing to confirm. This overlooks the distinction to be made between the acts of a sovereign power and an individual. With regard to the former, it has been held that a legislative act, unlike a deed of a private person, may confirm and make valid a void conveyance. *Wilkinson* v. *Leland*, 2 Pet. 627. In *Soulard* v. *The United States*, 4 id. 511, when considering the import of the term in a stipulation contained in the treaty by which Louisiana was acquired, providing that the inhabitants of that territory should be protected in the enjoyment of their property, the court say : " It comprehends every species of title, inchoate or complete. It is supposed to embrace those rights which are executory as well as those which are executed. In this respect the relation of the inhabitants to their government is not changed. The new government takes the place of that which has passed away." I think it cannot be questioned that had no treaty of cession taken place, the Mexican congress could have ratified and confirmed the unauthorized act of the governor in making this grant. Is the power of the American congress which succeeded the Mexican in the right to dispose of the public lands any less ? The act of confirmation is in law a conveyance by way of quit-claim and release of any interest which the United States may have had in the premises. If A should be in possession of a certain tract of land defined by certain natural boundaries, and B, being the owner thereof, should execute a release deed to A for the premises,

who would be warranted in saying that the deed conveyed less than the whole tract?

It is contended, however, that congress did not intend to confirm more than twenty-two square leagues of claim No. 14, because of what is said in the report of the senate committee upon this and other claims mentioned in the act of confirmation. The report of a committee of one house of congress is no expression of the will of both houses and of the executive. Where no ambiguity or doubt appears in the law, we think the same rule obtains here as in other cases, that the court should confine its attention to the law, and not allow extrinsic circumstances to introduce a difficulty, when the language is plain. Cooley's Const. Lim. 69. "In expounding this law," says TANEY, C. J., in *Aldridge* v. *Williams*, 3 How. 1, " the judgment of the court cannot, in any degree, be influenced by the construction placed upon it by individual members of congress in the debate which took place on its passage, nor by motives or reasons assigned by them for supporting or opposing amendments that were offered. The law, as it passed, is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself, and we must gather their intention from the language there used, comparing it, when any ambiguity exists, with the laws upon the same subject, and looking, if necessary, to the public history of the times in which it was passed."

Should we, however, overlook this salutary rule, it would appear that the report of the senate committee, when fully understood, shows that each claim was, by the committee, separately considered and passed, according to its merits, by the committee, and subsequently by congress.

Other considerations are urged in favor of a different construction of the act, but we deem it unnecessary to pursue them.

We are of the opinion that the judgment of the court below is correct, and accordingly affirm it.

*Affirmed.*