MILLER ET AL. *v.* DALE ET AL.   ·

1. In an action of ejectment for land in California, where both parties assert title to the premises, — the plaintiff under a concession of the former government, confirmed by the tribunals of the United States, and an approved survey under the act of Congress of June 14, 1860, and the defendant under a patent of the United States issued upon a similar confirmed concession, — the inquiry of the court must extend to the character of the original concessions to ascertain which of the two titles gave the better right to the premises; and, if these do not furnish the means for settling the controversy, reference must be had to the proceedings before the tribunals and officers of the United States by which the claims of the parties were determined.

2. Where the original concessions in such cases were without specific boundaries, being floating grants for quantity, the one first located by an approved survey appropriated the land embraced by the survey.

3. The object of the proceeding before the tribunals of the United States for the approval of a survey of a confirmed claim to land in California under a Mexican or Spanish grant, pursuant to the act of Congress of June 14, 1860 (12 Stat. 34), was to insure conformity of the survey with the decree of confirmation, and not to settle any question of title against other claimants. The approval of the court established the fact, that the survey was in conformity with the decree of confirmation; or, if the decree was for quantity only, that the survey was authorized by it, and is conclusive as to the location of the land against all floating grants not previously located.

ERROR to the Supreme Court of the State of California.

*Mr. S. O. Houghton* for the plaintiffs in error.

*Mr. Jeremiah S. Black, contra.*

·MR. JUSTICE FIELD delivered the opinion of the court.

This is an action of ejectment for the possession of certain

real property situated in the county of Santa Clara, in the
State of California.    The plaintiffs assert title to the premises
under a concession of the former government, confirmed by the
tribunals of the United States, and an approved survey under
the act of Congress of June 14, 1860 (12 Stat. 34, sect. 5).
That act gives to an approved survey upon a confirmed claim
the effect and validity of a patent.    Some question is made,
whether this effect can be given to a survey approved, like the
one here, since the repeal of the act, notwithstanding the reser-
vation of jurisdiction in pending cases by the repealing clause.
We do not deem it material to determine the question, and, for
the purposes of this case, shall consider that the plaintiffs stand
before the court upon a title as fully established as if supported
by a patent.    The confirmation under which they claim was
·made by the District Court of the United States in January,
1859; and the survey was approved by that court in June, 1865,
and, on appeal, by the Circuit Court in September, 1866.

The defendants assert title to the premises under a patent
issued upon a concession of the Mexican government, confirmed
by the tribunals of the United States; the confirmation dating
in March, 1857, and the patent being issued in January, 1859.
The approved survey of the plaintiffs and the patent of the
defendants both include the land in controversy.    The ques-
tion, therefore, for consideration, is, which of the two titles
gave the better right to the premises.    To answer this question,
we must look into the character of the original concessions;
and, if they furnish no guide to a just conclusion, we must seek
a solution in the proceedings had before our tribunals and offi-
cers by which the claims of the parties were determined.

Looking at the original concessions, we find that they were
mere licenses to settle upon and occupy vacant lands of the
former government, without designation as to locality, except
in the most vague and general way.    It appears that one Ma-
riano Castro, through whom the plaintiffs trace their title, had,
as early as 1802, obtained permission from the Viceroy of Mexico
to settle upon a tract· of land within the jurisdiction of Mon-
terey, known as La Brea; but, objection to his settlement there
being made by the priests of the adjoining mission, he was
directed to select another tract.    He accordingly solicited of the

military commander of the district the tract called El Carne-
adero, alleged to be the same tract since known as Las Animas:
but whether any action was ever taken by the public authori-
ties upon his petition, further than to hear objections also made
by the priests to his settlement there, we are not informed; and
the archives of the department, searched by direction of the
governor, disclose nothing on the subject. After Castro's death,
his widow, in 1833, in a petition to the governor, represented
that her husband had taken possession of the tract, Las Animas,
in 1806, under a concession from the governor, but that she had
not the title-papers, and asked that a title be issued to her. In
1835 her attorney renewed the application, affirming that the
land had been granted to her husband, but that the title-papers
had been destroyed by fire. Upon receipt of this petition, the
governor ordered a search among the archives of the department
for a record of the alleged concession; but, as already stated,
none was found. In consideration, however, of the evidence
which they afforded of the right to the tract under the name
of La Brea, obtained by the deceased from the vice-royal gov-
ernment in 1802, the governor directed that a certificate or tes-
timonial of the record in the case (*expediente*) be issued for the
protection of the parties interested; and, as the boundaries had
not been expressly defined within which they must confine them-
selves, he added that those set forth in the plat accompanying
the petition of the attorney should in future be regarded as
such, with a reservation, however, of the rights of any third
party who might feel aggrieved by the proceeding. This cer-
tificate or testimonial, issued in 1835, with the documents upon
which it was founded, constituted the record evidence of the
concession upon which the confirmation and survey were had
under which the plaintiffs claim.

Previous to the issue of this document, and in 1831, another
person by the same name, Mariano Castro, under whom the
defendants claim, had obtained from the governor of Califor-
nia a license to occupy for cultivation a tract of land called
El Solis. Under this license he went into possession of vacant
land, and remained in possession until the cession of the coun-
try to the United States. His widow and children obtained
the decree of confirmation and patent.

Neither of the concessions transferred the title, or conferred upon the grantees any interest in the land occupied by them other than a right of possession during the pleasure of the government. Their possession under these licenses did not raise even an equity in their favor against the United States. *Serrano* v. *United States*, 5 Wall. 461. In this condition of the property, the party who first obtained a confirmation of his claim, and its definite location by an approved survey, took the title to the land embraced by the survey.

But, independent of this position, if we could regard the original concessions — the one issued to the first Castro in 1802, and the one issued to the second Castro in 1831 — as ordinary grants of the governor of the department, and, as such, passing a title, though of an imperfect character, to the grantees, the same result would follow; for they could then be treated only as floating grants. Neither of them gave any definite boundaries to the tract referred to by the general designation of place, and neither specified any quantity: that was only a matter of inference from subsequent documents. And equal vagueness as to the location and extent of the land solicited characterized the petitions of the parties. That of the first Castro only stated that La Brea was situated within the jurisdiction of Monterey, and distant three or four leagues from any mission or *pueblo*. The term appears to have been applied to a large region of country in that district. The petition of the second Castro only described El Solis, the tract which he desired, as a place within the jurisdiction of the same military post. Under these circumstances, the concessions being without specific boundaries by which the quantity embraced, when ascertained, could be identified, the only rule which the court can follow in actions at law is to consider the one first located by an approved survey as having appropriated the land covered by the survey. This rule was substantially recognized in one of the earliest cases which came before this court for consideration, — the *Fremont Case*, reported in the 17th of Howard. The grant to Alvarado, under which Fremont claimed, was for ten leagues within exterior boundaries embracing a much greater quantity; and while the court held, that, as between the government and the grantee, the grant passed to him a right to the quantity of land men-

tioned, to be laid off by .official authority in the territory described, it said, that, if any other person within those limits had afterwards obtained a grant from the government by specific boundaries before Alvarado had made his survey, the title of the latter grantee could not be impaired by any subsequent survey of Alvarado. "As between the individual claimants from the government," the court added, "the title of the party who had obtained a grant for the specific land would be the superior and better one; for, by the general grant to Alvarado, the government did not bind itself to make no other grant within the territory described until after he had made his survey." Referring to this language in the recent case of *Henshaw* v. *Bissell*, 18 Wall. 267, we observed that "a second floating grant, the claim under which is first surveyed and patented, and thus severed from the public domain, would seem to stand, with reference to an earlier floating grant within the same general limits, in the position which the subsequent grant with specific boundaries mentioned in the citation would have stood to the general grant to Alvarado."

Upon this rule the land department of our government constantly acts with reference to floating warrants issued under the legislation of Congress to soldiers and others. The warrant first located takes the land, though it bear date only of yesterday. The date of the warrant is of no moment. So with Mexican floating grants, except that they are usually confined within certain general limits: the one first located takes the land. Here the survey of the defendants was made and approved in 1858, several years before the approval of the survey under which the plaintiffs claim.

It is contended with much earnestness, that the fact that the survey of the plaintiffs received the approval of the district and circuit courts of the United States gave it conclusive efficacy upon the title, and determined that it was superior to that of the defendants. This position is based upon a misconception of the object of subjecting surveys of confirmed claims under Mexican concessions to the consideration of the court. It was not to settle the question of title: so important a matter affecting the rights of parties as that would hardly have been left to proceedings of a summary character. The object of the proceeding was to insure conformity of the survey with the

decree upon which it was made. If the decree gave specific boundaries, the court was to see that the survey followed them: if the decree was for quantity, the court was to see that the survey did not embrace a greater quantity; that the land was taken in a compact form, or if the grantee had himself exercised a right of selection, and had settled upon and improved particular parcels, or sold parcels to others, that the survey, if practicable, included such parcels, and also that it was made with proper regard to the rights of others who had settled upon the land, especially when they had been induced to make improvements by the grantee himself. Originally surveys were left entirely to the action of the local surveyor and the land department. Great complaints were sometimes made that surveys thus established were unjustly extended in directions so as to include the settlements and improvements of others; and contests over them were, in consequence, often prolonged for years. To prevent possible abuses in this way, the act of Congress of June 14, 1860, was passed, allowing surveys, when objection was made to their correctness, to be brought before the court and subjected to examination, and requiring them to be corrected if found to vary from the specific directions of the decrees upon which they were founded; or, if the decrees contained no specific directions, from the general rules governing in such cases. The approval of the court established the fact, that the survey was in conformity with the decree of confirmation; or, if the decree was for quantity only, that the survey was authorized by it; and in either case the approval rendered the survey conclusive as to the location of the land against all floating grants not previously located. The questions then left for controversy before the courts related to the title of the property, the parties proceeding upon the established conformity of their respective surveys with the decrees upon which they were founded.

The case of *Henshaw* v. *Bissell*, upon which counsel seem to rely, does not militate against the views here stated. The question there was not as to which of two floating grants carried the premises. Only one of the grants there under consideration was floating. The other grant had specific boundaries, or such descriptive features as to render its limits easily ascertainable; and the court held that the right of the grantee to

the land thus designated could not be interfered with by the donee of the floating grant. A grant of that specific description necessarily carried the land ·described, unless appropriated by an earlier grant; and no subsequent location of a floating grant upon the premises could impair the title.

It is urged that the testimonial issued in 1835, although intended primarily as evidence of the proceedings taken in 1802, and of the license granted by the Viceroy of Mexico, established the boundaries of the settlement of the first Castro; so that, from that time, the license ceased to be a general and floating one, and became a license to occupy a specific tract. Admitting this view of the effect of the testimonial to be correct, the answer is obvious, — the title of the grantee or licensee was not changed by a limitation of his right of occupation to a specific tract; and the designation of the boundaries reserved the rights of any third party, which were to be left uninjured, that is, not encroached upon. The second Castro was then in possession of a portion of the tract within those boundaries; his right being of the same character, — that of occupancy by permission of the government. The decree confirming his claim, and the survey following it, approved by the land department, are conclusive as to the extent of his possession. The plaintiff shows no better claim to the premises thus possessed by producing a testimonial establishing the boundaries of his settlement, which at the same time provided that existing rights of others should remain unaffected by the proceeding.

It was suggested on the argument that the decree confirming the concession of the El Solis rancho was obtained upon an erroneous and fraudulent translation of certain documents introduced into the case, which, if correctly translated, would have defeated the claim by showing that the concession was denied instead of being made by the Mexican government. If this be so, the plaintiffs can proceed in equity, where the land has not passed to *bona fide* purchasers without notice, to remove the obstacle to the operation of their title arising from the defendants' patent, or to compel the patentees to hold the land in trust for their benefit, or in some other appropriate way. But, in this action of ejectment, the plaintiffs must rely upon their legal title; and that arising subsequent to the title of the defendants they cannot recover.          *Judgment affirmed.*